# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-1390

_____

United States of America,                  *
                                            *
            Appellee,                       *
                                            *    Appeal from the United States
        v.                                  *    District Court for the
                                            *    Northern District of Iowa.
Steven Keith VandeBrake, also               *
known as Steve Keith VandeBrake,            *
                                            *
            Appellant.                      *

_____

Submitted: November 17, 2011
    Filed:  April 27, 2012

_____

Before RILEY, Chief Judge, BEAM and BYE, Circuit Judges.

_____

BYE, Circuit Judge.

Steven VandeBrake pleaded guilty to two counts of price fixing and one count of bid rigging in violation of 15 U.S.C. § 1. The guilty plea was pursuant to a non-binding plea agreement he reached with the government after the district court[1] indicated it would not accept a binding plea agreement calling for a sentence of nineteen months. The district court sentenced VandeBrake to forty-eight months of imprisonment followed by three years of supervised release, and imposed a fine of

_____

[1]The Honorable Mark W. Bennett, United States District Judge for the Northern District of Iowa.

$829,715.85. In selecting a sentence of forty-eight months, the district court varied upward from the advisory guidelines range based primarily upon VandeBrake's lack of remorse and the court's policy disagreement with United States Sentencing Guidelines Manual (U.S.S.G.) § 2R1.1. VandeBrake appeals his sentence contending the district court abused its discretion by not accepting the binding plea agreement. He also contends the sentence of forty-eight months, as well as the amount of the fine, are substantively unreasonable. We affirm.

I

In 1994, VandeBrake took over his family's concrete business in Orange City, Iowa. Fourteen years later VandeBrake sold the family business to Grupo Cementos de Chihuahua (GCC), a Mexico-based corporation which operates close to two dozen cement plants in Iowa. GCC formed GCC Alliance Concrete (Alliance), and VandeBrake thereafter worked as a sales manager for the new company. In March 2009, the United States Department of Justice (DOJ) began investigating VandeBrake for his involvement in a bid-rigging conspiracy arising from the sale of concrete products in northern Iowa. The investigation began after one of Alliance's competitors reported the bid-rigging conspiracy to the DOJ under the Antitrust Division's Leniency Program.[2]

The DOJ's investigation confirmed the existence of a bid-rigging conspiracy between VandeBrake's company, Alliance, and two of its competitors, as well as a price-fixing scheme between Alliance and a third competitor. As a result of the investigation, the government filed a criminal information against VandeBrake charging him with three antitrust violations of 15 U.S.C. § 1, two counts for bid rigging and one count for price fixing. Through his counsel, VandeBrake engaged

---

[2]For more information on the Antitrust Division's Leniency Program, go to www.justice.gov/atr/public/criminal/leniency.htm.

in extensive negotiations with the DOJ's Antitrust Division, ultimately reaching an agreement whereby the parties would ask the district court to accept a binding plea agreement under Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. The binding agreement, if accepted by the district court, called for VandeBrake to serve a sentence of nineteen months and pay a fine of $100,000 for his role in the bid-rigging and price-fixing conspiracies.

Shortly after VandeBrake entered guilty pleas to all three counts before a magistrate judge, the district court entered an order announcing it would not accept the binding plea agreement. The district court scheduled a hearing under Rule 11(c)(5) to discuss the matter. At the hearing, the district court disclosed the reasons why it was not accepting the binding plea agreement, which included: 1) the leniency of the sentence in light of VandeBrake's conduct; 2) a policy disagreement with the antitrust guidelines; 3) the presence of codefendants and the need to give fair sentences to each defendant after reviewing all of the applicable presentence investigation reports (PSRs), which the district court had not yet done; 4) the DOJ attorney's relative lack of experience when compared to the district court's own sentencing experience; and 5) a reluctance to surrender the district court's sentencing discretion in light of the other factors just mentioned.

Ultimately, however, the district court did not reject the binding plea agreement, but gave VandeBrake the option of going forward with the sentencing hearing, after which the district court would decide whether to accept or reject the binding plea agreement. See Fed. R. Crim. P. 11(c)(3)(A) (indicating a district court "may accept [a binding] agreement, reject it, or defer a decision until the court has reviewed the presentence report"). Speaking with candor, the district court represented "there's probably a less than 10 percent chance that I would accept the plea" if the parties opted to go forward with the sentencing hearing first. The district court recessed briefly to allow the parties to discuss their options. After the recess, VandeBrake indicated he still wanted to plead guilty, but would plead to a non-

binding plea agreement under Rule 11(c)(1)(B) rather than a binding plea agreement under Rule 11(c)(1)(C). The district court accepted VandeBrake's guilty plea pursuant to the non-binding plea agreement.

Prior to sentencing, the district court ordered a PSR prepared. The PSR discussed, among other things, the length and scope of the concrete bid-rigging and price-fixing conspiracies. The first bid-rigging conspiracy took place between Alliance and one of its competitors from June 2008 through March 2009. The second bid-rigging conspiracy took place between Alliance and a second competitor from January 2008 through August 2009. The price-fixing conspiracy took place between Alliance and a third competitor from January 2006 through August 2009. The PSR calculated the volume of commerce affected by each conspiracy to be $591,000, $95,000, and $4,845,439.61, respectively, for a total of $5,531,439.61.[3] Using the antitrust guideline set forth in U.S.S.G. § 2R1.1, which includes adjustments for the volume of commerce attributable to a defendant, the PSR calculated a final offense level of sixteen. The advisory guidelines range was 21-27 months.

The district court conducted a three-day sentencing hearing for VandeBrake and one of his codefendants. Following the sentencing hearing, the district court issued a detailed memorandum indicating it was varying upward from the advisory guidelines range by imposing a sentence of forty-eight months. The two primary reasons given by the district court for the variance were a policy disagreement with the antitrust guidelines and VandeBrake's lack of remorse for his crimes. The district court's policy disagreement focused on the Sentencing Commission's choice to increase the offense levels for antitrust violations less rapidly than the offense levels for fraud violations despite the comparable societal harm targeted by both the fraud

---

[3]For a more extensive discussion and explanation of the three conspiracies and additional factual background involved in this case, see the district court's reported decision at United States v. VandeBrake, 771 F. Supp. 2d 961, 967-82 (N.D. Iowa 2011).

and antitrust guidelines. The district court also indicated why it believed the Commission's explanation for the disparity did not apply in VandeBrake's situation.

> The court further concludes that because of a flaw in U.S.S.G. § 2R1.1(b)(2), application of that section fails to provide a just and reasoned sentencing range given the facts of VandeBrake's case. The Sentencing Commission has explained that the offense levels for antitrust violations were increased in § 2R1.1 "to make them more comparable to the offense levels for fraud with similar amounts of loss." U.S.S.G. app. C, amend. 377. The base offense level for antitrust violations begins at a higher level than the base offense level for fraud violations "in order to reflect the serious nature of and the difficulty of detecting such violations." Id. However, the base offense level for antitrust violations then increases less rapidly than the offense level for fraud violations "in part, because, on the average, the level of mark up from an antitrust violation may tend to decline with the volume of commerce involved." Id. This assumption is incorrect in this case, particularly with respect to VandeBrake's price-fixing of concrete sales through [Alliance's] price list. [Alliance] would establish a price list in January for a given year and then stick to that price list for the remainder of the year. Because [Alliance's] price list was based on a per cubic yard price, [Alliance's] price for its concrete did not decrease with volume. Thus, the level of mark up here for VandeBrake's price-fixing violations did not decline with the volume of commerce involved. Consequently, [Alliance's] unit cost of production should have decreased as production increased, thereby increasing the profits to be drawn from VandeBrake's antitrust activities and increasing the losses to his victims.

> Therefore, there is no basis in this case for the base offense level for VandeBrake's antitrust violations to increase less rapidly than the offense level for comparative fraud violations. The court notes that the volume of commerce in this case, as agreed by the parties, is $5,666,439. The commentary to § 2R1.1 indicates that:

>> It is estimated that the average gain from price-fixing is 10 percent of the selling price. The loss from price-fixing exceeds the gain because, among other things, injury is

inflicted upon consumers who are unable or for other reasons do not buy the product at the higher prices.

U.S.S.G. § 2R1.1 cmt. 3. Ten percent of the affected volume of commerce in this case is $566,634. Thus, the estimated loss to VandeBrake's victims in this case is more than $566,634. Under such circumstances, the fraud guideline § 2B1.1(b)(1)(H) directs a fourteen level increase because the resulting loss in this case is more than $400,000 but less than $1,000,000. This is substantially more than the meager two point increase called for by § 2R1.1(b)(2)(A) and leads the court to find that application of that section fails to provide a just and reasoned sentencing range given the facts here. Accordingly, the court finds that the "nature and circumstances of the offense," 18 U.S.C. [§] 3553(a)(1), "the need for the sentence imposed-to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," 18 U.S.C. § 3553(a)(2)(A), each justify the need for substantial punishment above the guideline sentence and warrants a variance of VandeBrake's sentence above the applicable guideline sentence.

United States v. VandeBrake, 771 F. Supp. 2d 961, 1004-05 (N.D. Iowa 2011) (internal footnote omitted).

The district court also justified its variance when taking into account "the history and characteristics of the defendant" pursuant to 18 U.S.C. § 3553(a)(1), focusing on VandeBrake's lack of remorse.

What the court finds most disquieting about VandeBrake's history and characteristics is that VandeBrake was already wealthy when he embarked on and engaged in the charged conspiracies. VandeBrake can make no claim to be a latter-day Jean Valjean, the unemployed protagonist in Victor Hugo's Les Miserables who was imprisoned for stealing a loaf of bread to feed his widowed sister's seven children. As this court recently recognized, "[a] crime of fraud by one who already has more than enough—and who cannot argue that he suffered a

deprived or abusive childhood or the compulsion of an expensive addiction—is simply a crime of greed." United States v. Miell, 744 F. Supp. 2d 904, 955 (N.D. Iowa 2010). Nearly as disturbing is the fact that VandeBrake fails to believe that he was motivated by greed. Instead, VandeBrake continues to justify and rationalize his conduct. He excuses his criminal conduct by reasoning that he gave [Alliance's] customers a "great product for a good price." Sentencing Tr., Vol. 1 at 251. VandeBrake's self-serving rationalizations reflect a total lack of remorse for his criminal conduct in his case. Also, it has not escaped the court's attention that VandeBrake initiated the conspiracies charged in Counts 1 and 3. Thus, he cannot claim to have been unwittingly duped into joining and participating in those charged conspiracies. Equally troubling is the fact that VandeBrake is one of the few white collar defendants I have sentenced where the sentencing record is totally devoid of *any* community work, participation in any service organizations, or charitable giving. There is no record evidence of even a single good deed done by VandeBrake for anyone other than his family. VandeBrake makes a mockery of the adage that "to whom much is given, much is expected."

Thus, the court finds that VandeBrake's history and characteristics warrant more significant punishment than the advisory guidelines might mete out, despite VandeBrake's lack of prior criminal history. Instead, these factors warrant a variance of VandeBrake's sentence above the applicable guideline sentence.

VandeBrake, 771 F. Supp. 2d at 1005-08 (internal footnote omitted).

Finally, the district court gave a detailed explanation of the fine amount it chose, considering all the factors listed at 18 U.S.C. § 3572(a)[4] and the Sentencing

---

[4]The district court considered:

VandeBrake's income; earning capacity; financial resources; the burden on VandeBrake and his dependents; pecuniary loss inflicted on others as a result of the offense; whether restitution is ordered; the need to

Commission's directive that "[t]he amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive." Id. at 1012 (quoting U.S.S.G. § 5E1.2(d)(2)). The district court determined the antitrust guidelines' recommended fine range (based on one to five percent of the volume of commerce) was "woefully inadequate" because of the amount of loss involved in VandeBrake's case. Id. at 1011. The district court justified its upward *variance* based on the guidelines' recommendation that an upward *departure* may be warranted "where two times the amount of loss resulting from the offense exceeds the maximum guideline fine." Id. at 1012 (citing U.S.S.G. § 5E1.2, cmt. 4). In determining the amount of loss to VandeBrake's customers, the district court relied upon the Sentencing Commission's determination that the amount of loss involved in an antitrust violation is greater than ten percent of the volume of commerce involved. Id. (citing U.S.S.G. § 2R1.1 cmt. 3). The district court ultimately chose an amount which represented fifteen percent of the volume of commerce involved in VandeBrake's case, concluding:

> VandeBrake is an extremely wealthy individual, with a net worth over $10,000,000. VandeBrake's wealth and assets are particularly pertinent to consider in determining the proper amount of his fine because a $829,715.85 fine, while in the abstract is a large sum of money, is quite modest when compared to VandeBrake's overall wealth. Only by imposing a fine of such a large amount does the fine become sufficiently proportionate to VandeBrake's wealth to properly reflect the gravity of his offenses. Given VandeBrake's wealth, the court finds that a $829,715.85 fine is appropriate in order to ensure that it is "sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive." U.S.S.G. § 5E1.2(d)(2); see United States v. Koestner, 628

---

deprive VandeBrake of illegal gains; the expected costs of VandeBrake's imprisonment and supervised release; and the need to promote respect for the law, provide just punishment, and adequate deterrence.

Id. at 1011 (citing 18 U.S.C. § 3572(a)).

F.3d 978, 979 (8th Cir. 2010) (affirming the imposition of a $100,000 fine which was $70,000 above the advisory guidelines range where the defendant was a "millionaire" and such a fine was appropriate to ensure that the sentence was punitive to the defendant).

VandeBrake, 771 F. Supp. 2d at 1012.

VandeBrake filed a timely appeal. On appeal, he contends the district court abused its discretion by not accepting the binding plea agreement. He also contends the sentence of forty-eight months and fine of $829,715.85 are substantively unreasonable.

II

VandeBrake contends the district court abused its discretion by not accepting the Rule 11(c)(1)(C) binding plea agreement. The government responds by contending VandeBrake waived this claim when he chose to plead guilty to a non-binding plea agreement under Rule 11(c)(1)(B). We agree with the government.

We first note the district court did not actually reject the binding plea agreement. The district court has three choices when presented with a binding plea agreement proposed by the parties. It may accept the binding plea agreement, reject it, or defer a decision until after reviewing the presentence report. Fed. R. Crim. P. 11(c)(3)(A). Here the district court chose the third option by deferring its decision. VandeBrake then chose to enter a non-binding plea agreement with the government. The new plea agreement did not preserve VandeBrake's right to challenge the district court's nonacceptance of the binding plea agreement; it was unconditional.

"[A] guilty plea represents a break in the chain of events which has preceded it in the criminal process." Tollett v. Henderson, 411 U.S. 258, 267 (1973). "It is established that an unconditional plea of guilty waives all prior infirmities which

neither affect the court's jurisdiction nor the substantive sufficiency of the indictment." United States v. Barker, 594 F.2d 709, 710 (8th Cir. 1979). The only Rule 11 issues we have considered on appeal following an unconditional guilty plea are those which "call[] into question the knowing and voluntary nature of a plea, and thus its validity," including challenges to the "adequacy of a factual basis" for the plea. United States v. Frook, 616 F.3d 773, 775 (8th Cir. 2010). VandeBrake does not claim his decision to enter the non-binding plea agreement was unknowing or involuntary, nor does he challenge the factual basis for the plea. Under these circumstances, we conclude VandeBrake's unconditional guilty plea waived the right to complain about the district court's alleged indiscretions with respect to the binding plea agreement. See United States v. Rivera, 209 F. App'x 618, 620-21 (8th Cir. 2006) (declining to address a claim that a district court abused its discretion in rejecting a binding plea agreement where the defendant subsequently entered a second plea agreement "made with a full understanding of the possible consequences[,]" concluding the second plea agreement "cured any prejudice possible" from the district court's rejection of the first agreement); see also United States v. Walker, 927 F.2d 389, 390-91 (8th Cir. 1991) (addressing the merits of a claim involving a rejected plea agreement but only because the defendant's second plea agreement "allowed appellant to enter a conditional guilty plea with leave to pursue this appeal[,]" and nevertheless concluding the defendant's "subsequent action of entering into a new plea agreement cured any potential prejudice" from the alleged infirmities associated with the first plea proceeding).[5]

VandeBrake next contends his sentence of forty-eight months and fine of $829,715.85 are substantively unreasonable. We review these claims under a

[5]Based on our conclusion that VandeBrake waived the right to challenge the district court's non-acceptance of the binding plea agreement, we deny VandeBrake's pending motion to enforce the binding plea agreement. In addition, VandeBrake filed a motion asking us to take judicial notice of a transcript in an unrelated case. Because that pending motion also relates to the same waived claim, we deny it as well.

standard akin to an abuse-of-discretion standard, "cognizant that 'it will be the unusual case when we reverse a district court sentence-whether within, above, or below the applicable Guidelines range-as substantively unreasonable.'" United States v. Deegan, 605 F.3d 625, 634 (8th Cir. 2010) (quoting United States v. Feemster, 572 F.3d 455, 464 (8th Cir. 2009)).

The district court gave two primary reasons for varying upward from the guidelines range: (1) a policy disagreement with the antitrust guidelines, and (2) VandeBrake's lack of remorse. Both were permissible reasons for varying from the guidelines. See United States v. Battiest, 553 F.3d 1132, 1137 (8th Cir. 2009) (noting a policy disagreement may provide a basis for a district court's variance from the advisory guidelines range) (citing Kimbrough v. United States, 552 U.S. 85, 110-11 (2007)); United States v. Hildebrand, 152 F.3d 756, 766 (8th Cir. 1998), abrogated on other grounds by Whitfield v. United States, 543 U.S. 209, 212 (2005) (recognizing a district court is entitled to consider a defendant's lack of remorse, among other things, "[i]n selecting a point within the appropriate guideline range, or in deciding whether a departure is warranted"); see also United States v. Chase, 560 F.3d 828, 832 (8th Cir. 2009) (explaining that factors which may justify a departure can also be used to justify a variance).

VandeBrake's primary complaint regarding the substantive unreasonableness of his sentence is that its length equals the longest sentence ever imposed in an antitrust case. He argues the volume of commerce and duration of the conspiracies involved in his case pale in comparison to the only other forty-eight month sentence imposed in an antitrust case. The length of VandeBrake's sentence, however, results in large part from the district court's policy disagreement with the antitrust guidelines. The district court believed the antitrust guidelines are too lenient, and consequently gave VandeBrake a more severe sentence than the within-the-guidelines' sentence VandeBrake cites for comparison purposes. Because the district court varied from the guidelines, VandeBrake's sentence will necessarily differ when compared to a

within-the-guidelines' sentence. That mere fact does not *ipso facto* make the sentence substantively unreasonable. See, e.g., Kimbrough, 552 U.S. at 107-08 (rejecting the government's argument that nonmandatory guidelines would result in defendants with similar conduct receiving "markedly different sentences, depending on nothing more than the particular judge drawn for sentencing" by stating "our opinion in Booker recognized that some departures from uniformity were a necessary cost of the remedy we adopted").

VandeBrake also claims the district court gave invalid reasons for its policy disagreement with the guidelines. We disagree. The district court gave cogent reasons for its policy disagreement by comparing the antitrust guidelines to the fraud guidelines which attack a similar societal harm. The district court also tied its policy disagreement to the specific facts involved in VandeBrake's case, noting VandeBrake's prices for concrete did not decrease as the volume of sales increased, the primary reason the Sentencing Commission gave for increasing the levels of antitrust violations less drastically than levels of fraud cases depending on the relative amount of loss or volume of commerce involved. VandeBrake contends the district court was mistaken about his prices not decreasing as the volume of the sale increased, contending he gave discounted prices in almost all of his sales. But as the government correctly notes, the benchmark for the discounts was always VandeBrake's artificially inflated price list. "Thus, whether setting the discounted price per cubic yard at an artificially high level, or the list price from which the standard per cubic yards discounts were given at an artificially high level, VandeBrake was able to ensure that his profits were also standard and artificially high for each 'type of entity' he sold his over-priced concrete to." Appellee's Br. at 39.

We respectfully disagree with the dissent's view that the district court's policy disagreement with antitrust guideline § 2R1.1 turns on some aspect of the guideline which "exemplif[ies] the Commission's exercise of its characteristic institutional role" in light of "empirical data and national experience" such that "closer review" of the

-12-

district court's decision "may be in order[.]" Kimbrough, 552 U.S. at 109. Indeed, as the dissenting opinion itself demonstrates, the Commission's revisions to the antitrust guidelines have largely been in response to Congressional acts. See Post at 8 ("Following Congress's cue [referring to S. Rep. No. 98-225, at 177, suggesting white collar criminals were too frequently sentenced to probation or short terms of imprisonment] the Commission's first version of the [antitrust] guidelines increased the mean sentences of white-collar crimes above then-current averages to reduce the disparity between white-collar crimes and other property crimes, such as larceny."); post at 10 (indicating the Commission's 2005 amendment to § 2R1.1 "was in response to Congress's enactment of the Antitrust Criminal Penalty Enhancement and Reform Act of 2004, which increased from three to ten years the maximum term of imprisonment for antitrust violations under 15 U.S.C. §1"). Similarly, in Kimbrough, the fact that the Commission merely responded to a Congressional act in adopting the 100:1 powder/crack ratio (i.e., the mandatory minimum sentences set in the 1986 Act) was expressly why the Supreme Court stated the "crack cocaine Guidelines . . . present no occasion for elaborative discussion of this [closer review] matter[.]" 552 U.S. at 109.

The dissent's approach conflicts not only with Kimbrough itself, but with other circuits that have addressed Kimbrough's suggestion for "closer review" of some district court sentencing decisions. Those circuits have focused on whether the Commission developed a particular guideline "based on research and study rather than reacting to changes adopted or directed by Congress." United States v. Grober, 624 F.3d 592, 601 (3d Cir. 2010); see also United States v. Henderson, 649 F.3d 955, 960, 962 (9th Cir. 2011) (concluding "district judges must enjoy the same liberty to depart from [the child pornography Guidelines] based on reasonable policy disagreement as they do from the crack-cocaine Guidelines discussed in Kimbrough" because "[m]ost of the revisions [to § 2G2.2] were Congressionally-mandated and not the result of an empirical study"). In Grober, a district court based its sentencing decision upon a policy disagreement with the child pornography guideline at U.S.S.G.

-13-

§ 2G2.2. After conducting an extensive examination of the development of § 2G2.2, the Third Circuit did not employ Kimbrough's closer review because "the Commission did not use an empirical approach to develop § 2G2.2, but instead amended it repeatedly at the direction of Congress[.]" 624 F.3d at 607 (citing United States v. Dorvee, 616 F.3d 174, 186 (2d Cir. 2010)). The Third Circuit employed the same abuse-of-discretion/substantive unreasonableness standard we use here and affirmed the district court's sentence, stating "the Court explained at great length, both at sentencing and in its written opinion, the reasons it was concerned about § 2G2.2 in general and as applied to Grober in particular, and why it selected the sentence it did." Id. at 601.

Likewise, here the district court not only explained at great length why it was concerned about § 2R1.1 in general, but more importantly, explained how the guideline applied to (or rather, did not adequately account for) VandeBrake's particular offense conduct. The crux of the district court's policy disagreement with § 2R1.1 was the Commission's assumption that the level of mark-up from an antitrust violation may tend to decline with the volume of commerce involved. The district court explained why such an assumption did not apply to VandeBrake, because VandeBrake's concrete prices did not decrease with volume. Thus, in this case, the only aspect of § 2R1.1 which is relevant when considering the guideline's development is the volume of commerce gradations set forth therein. Even if that aspect of § 2R1.1 were the product of the Commission's institutional strengths,[6] we

_____

[6]We are not willing to accept the dissent's view that the district court's decision must be given "closer review," however, because to whatever extent the volume of commerce gradations were actually based on empirical data (a point the dissent never explains), the Commission itself put so many qualifications on its assumption that it should be given little weight. See U.S.S.G. app c. amend. 377 ("[T]he offense levels for antitrust offenses based on volume of commerce increase less rapidly than the offense levels for fraud, *in part*, because, *on the average*, the level of mark-up from an antitrust violation *may tend* to decline with the volume of commerce involved.") (emphasis added).

would still employ deferential substantive reasonableness review in this case because the district court's sentencing decision was "based on the *particular* facts of an *individual* case, which is entitled to 'greatest respect' because it exemplifies the district court's institutional strengths." Post at 6 (quoting Kimbrough, 552 U.S. at 109).

We also respectfully disagree with the dissent's view that Kimbrough's "closer review" language necessarily equates to de novo review, as opposed to still falling somewhere within our well-accepted post-Booker review for substantive reasonableness. The facts and circumstances involved in this case well exemplify that point. Contrary to the dissent's view, the district court committed no procedural error when it sentenced VandeBrake. The district court properly calculated the advisory guidelines sentencing range at step one of the sentencing process, and limited consideration of its policy disagreement with the antitrust guidelines to step three of the sentencing process. See, e.g., United States v. Shannon, 414 F.3d 921, 923-24 (8th Cir. 2005) (discussing the three-step sentencing process followed by district courts in the post-Booker sentencing regime).[7]  Importantly, the district court's variance from the advisory guidelines range was based only in part on its general policy disagreement with the antitrust guidelines. More significantly (as we discussed above), the district court's sentencing decision was primarily based on how the antitrust guideline applied to VandeBrake in particular, as well as the district court's consideration of individual characteristics of this defendant untethered to the antitrust guideline (i.e., VandeBrake's lack of remorse). As such, the final sentence in this case would have reflected a mix of the comparative institutional abilities of both the trial court and the Sentencing Commission, even assuming the district court's

---

[7]The three steps in the post-Booker sentencing process are: (1) "to determine the [initial] advisory guideline sentencing range," (2) to determine "any appropriate departures [upward or downward] from the guidelines[,]" and (3) to decide whether "to vary from the advisory guideline range based on the factors set forth in § 3553(a), so long as such a variance is reasonable." Shannon, 414 F.3d at 923.

-15-

policy disagreement with § 2R1.1 touched upon some aspect of the guideline based on research and empirical data.

In such a situation, when reviewing one final, indivisible sentencing decision which reflects a mix of the comparative institutional abilities of both the trial court and the Commission, we would follow the lead of at least one member of the Supreme Court who would still categorize Kimbrough's closer review as falling within the "framework for evaluating 'reasonableness.'" Pepper v. United States, 131 S.Ct. 1229, 1254 (2011) (Breyer, J., concurring). Under such a framework, while appellate courts would review those aspects of a sentencing decision "more closely when they rest upon disagreement with Guidelines policy," and "with greater deference when they rest upon case-specific circumstances[,]" our overall review would still be under the rubric of "reasonableness." Id. at 1255.

In this case, the district court's policy disagreement was based in large part upon case-specific circumstances, and the end result was an antitrust sentence more comparable to a fraud sentence based upon a similar amount of loss. As such, the district court's final sentence seems eminently consistent with the very rationale used by the dissent to attack it. See Post at 10 ("Since '[t]he Commission ha[d] long recognized the similarity of antitrust offenses to sophisticated frauds,' the Commission amended § 2R1.1 to ensure 'that penalties for antitrust offenses will be coextensive with those for sophisticated frauds sentenced under § 2B1.1.'") (quoting U.S.S.G. app. C, amend. 678).

In sum, we find no basis for concluding the final sentence is substantively unreasonable. The district court considered appropriate factors in varying from the guidelines, and adequately explained its sentence. See, e.g., United States v. Hill, 552 F.3d 686, 690-92 (8th Cir. 2009) (affirming a sentence of fifty-one months (thirty months above the advisory guidelines range) where the district court adequately explained its sentence, noting the sentencing judge is in a "superior position" to

evaluate the facts of any given case and judge their significance against the § 3353(a) factors) (internal quotation marks and citation omitted). Similarly, the district court considered appropriate factors in selecting the fine amount, and adequately explained its chosen amount. We find no basis for concluding the amount of the fine is substantively unreasonable.

III

We affirm the judgment of the district court.

RILEY, Chief Judge, concurring.

I concur in the general reasoning and the conclusion of Judge Bye's opinion. I write separately to disassociate myself from the district court's comments about economic success and status, race, heritage, and religion. I consider those comments inappropriate and not a proper reason for supporting any sentence.

BEAM, Circuit Judge, dissenting.

Early in its lengthy sentencing colloquy the district court, quoting Judge Learned Hand, states, "'[A] judge . . . is charged to see that the law is properly administered and it is a duty which he cannot discharge by remaining inert.'" United States v. VandeBrake, 771 F. Supp. 2d 961, 966 (N.D. Iowa 2011) (quoting United States v. Marzano, 149 F.2d 923, 925 (2d Cir. 1945)). There is, though, something to be said for some measure of inertness in the course of a criminal sentencing procedure fueled at the outset by a judicial observation that the defendant suffered from "insatiable greed, which is all the more shocking because [the defendant was] already [a] wealthy, multi-millionaire businessm[a]n." Id. at 965. Of course, even a multi-millionaire businessman has the right to be sentenced under the rule of law, especially rules recently put in place by the Supreme Court. Rich persons, poor

-17-

persons and persons at all other economic strata should expect no less. Indeed, a United States Judge upon assuming office takes an oath that states, in part: "I will administer justice without respect to persons, and do equal right to the poor and to the rich." 28 U.S.C. § 453. Make no mistake about it though, VandeBrake committed serious violations of federal law and deserves substantial penalties as a result, whatever the bestowal of economic largess upon him.

As noted by the court majority, VandeBrake was charged with three price fixing and bid rigging offenses in violation of 15 U.S.C. § 1. Ante at 1. He entered guilty pleas to these antitrust crimes, which triggered the use of U.S.S.G. § 2R1.1, the antitrust guideline. At this point, however, the district court (sometimes sentencing court) concluded that this guideline was flawed because, in the court's view, it is "overly lenient" with respect to all antitrust offenders, VandeBrake, 771 F. Supp. 2d at 1003, and "fail[ed] to provide a just and reasoned sentencing range given the facts of [this] case." Id. at 1004.

Apparently in an attempt to avoid a claim of procedural error,[8] the district court purported to calculate a guidelines sentencing range using § 2R1.1 but then set it aside in favor of an alternate calculation using U.S.S.G. § 2B1.1, the guideline for offenders convicted of fraud.[9] As a result of this switch, § 2B1.1, for all practical

---

[8]"In reviewing a challenge to a sentence, we 'must first ensure that the district court committed no significant procedural error.'" United States v. Dace, 660 F.3d 1011, 1013 (8th Cir. 2011) (quoting Gall v. United States, 552 U.S. 38, 51 (2007)). "[P]rocedural error" includes "failing to calculate (or improperly calculating) the [g]uidelines range." Gall, 552 U.S. at 51.

[9]Specifically, the sentencing court started by calculating the "volume of commerce" attributable to VandeBrake at $5,666,348.61. VandeBrake, 771 F. Supp. 2d at 971. Based on the volume of commerce table employed in the antitrust guideline, see U.S.S.G. § 2R1.1(b)(2), the court then calculated VandeBrake's guidelines range at 21 to 27 months' imprisonment. VandeBrake, 771 F. Supp. 2d at

-18-

purposes, became the paradigm for the final formation of VandeBrake's very substantial sentence. This failure to use the antitrust guideline for antitrust violations resulted in procedural error.

How could this guideline substitution have happened given Congress's and the Sentencing Commission's concerns about substantial uniformity in preliminary sentence calculations for identical criminal conduct–into which initial calculations judges would then insert variable, relevant circumstances and characteristics of individual offenders and, in this way, construct equitable and reasonable individualized penal judgments? It happened, apparently, because the sentencing court interpreted the Sentencing Commission's antitrust guideline formulations as

990. Because the sentencing court thought this range was "woefully inadequate," id. at 999, it effectively scrapped the antitrust guideline in favor of the fraud guideline, § 2B1.1, which increases offense levels based on "loss" instead of "volume of commerce." Id. at 1005. Faced with the inherent difficulty of calculating "loss" in this antitrust case, the district court consulted § 2R1.1's commentary regarding fine-setting for organizational antitrust offenders, which provides "'[i]t is estimated that the average gain from price-fixing is 10 percent of the selling price. The loss from price-fixing exceeds the gain . . . .'" Id. (quoting U.S.S.G. § 2R1.1 cmt. 3). Based on this language, the district court theorized that the amount of "loss" caused by VandeBrake was more than ten percent of the volume of commerce–i.e., more than $566,634. Id. Then, employing some sort of guidelines alchemy, the court interjected its fabricated "loss" figure into the fraud guideline's loss table, U.S.S.G. § 2B1.1(b)(1), to arrive at a guidelines range of 46 to 57 months' imprisonment. VandeBrake, 771 F. Supp. 2d at 1005, 1009. This erroneous transmogrification of the antitrust guideline increased VandeBrake's base offense level by fourteen levels as opposed to the two-level increase called for under § 2R1.1. Compare U.S.S.G. § 2R1.1(b)(2)(A) with id. § 2B1.1(b)(1)(H). When considering this bifurcated computation in light of the sentencing factors listed in 18 U.S.C. § 3553(a)(1), (2), the district court purported to discern the "need for substantial punishment above the [§ 2R1.1] guideline sentence." VandeBrake, 771 F. Supp. 2d at 1005. In essence, this exercise functioned as a categorical rejection of § 2R1.1 as a guideline useable in antitrust sentencing.

being inadequate for use in sentencing antitrust offenders in general,[10] see VandeBrake, 771 F. Supp. 2d at 1003, and in particular, at least when a defendant, as the court measures it, is a rich and greedy businessman, see id. at 965.

Where does a sentencing court find such unfettered authority, especially when failure to employ a Commission-designated guideline at the outset will surely result in widely varying sentences for substantially similar wrongdoers? To this inquiry, the sentencing court and court majority reply: Kimbrough v. United States, 552 U.S. 85 (2007), Spears v. United States, 555 U.S. 261 (2009) (per curiam), and Feemster v. United States, 572 F.3d 455 (8th Cir. 2009) (en banc).

But, no such authority can be gleaned from these cases.

---

[10]I disagree with the majority's characterization that "[t]he crux of the district court's policy disagreement" was the Commission's rationale regarding the level of mark-up involved in antitrust violations. Ante at 14. Indeed, "at the outset," before ever discussing levels of mark-up, the sentencing court opined that, "in [its] view," the antitrust guideline was "overly lenient" and categorically "deserving of less deference." VandeBrake, 771 F. Supp. 2d at 1000-03. While doing so, the district court implied that § 2R1.1's "overly lenient" sentences stem from the Sherman Act's historic preferential treatment of "wealthy, white, Anglo-Saxon, protestant males who were politically well-connected." Id. at 1003. These emanations were cast against the backdrop of the first paragraph of the district court's order, which characterized VandeBrake as a "wealthy, multi-millionaire businessm[a]n." Id. at 965. As now-Justice Sotomayor wrote as a dissenting circuit judge in United States v. Cavera, "arbitrary and subjective considerations, such as a judge's feelings about a particular type of crime, should not form the basis of a sentence." 550 F.3d 180, 220 (2d Cir. 2008) (en banc) (Sotomayor, J., dissenting); see also United States v. Irey, 612 F.3d 1160, 1211 (11th Cir. 2010) (en banc), cert. denied, 131 S. Ct. 1813 (2011) (ruling that a sentencing judge's "'conclusory statement of personal belief'" is insufficient to support a policy-based variance) (quoting United States v. Lychock, 578 F.3d 214, 220 (3d Cir. 2009)).

The basic holding of Kimbrough (which dealt exclusively with the guidelines' 100:1 powder/crack ratio) is that a district court has deferential discretionary authority to substantially vary from a correctly calculated guidelines range, based exclusively upon the court's policy disagreement with a particular guideline, *if* the guideline at issue is *not* the product of the Commission's institutional strengths.[11] 552 U.S. at 109. But, this is not true if the guideline at issue "exemplif[ies] the Commission's exercise of its characteristic institutional role." Id.; Spears, 555 U.S. at 264. The court majority's error today is manifest in its failure to apply this limitation and its act of reviewing the district court's extended and erroneous sentencing exercise using only a deferential abuse of discretion standard.

To support my contention, I briefly review the procedural requirements at work in this sentencing dispute. Even though, since United States v. Booker, 543 U.S. 220, 245 (2005), all sentencing guidelines are advisory in nature, they nonetheless continue to serve an important and mandatory function in the creation of a federal criminal sentence. Kimbrough, 552 U.S. at 108. Using the guideline or guidelines designated by the Sentencing Commission for use with the particular offense or offenses of conviction, the sentencing court is initially charged with calculating a guideline sentencing range for the defendant. In fact, it is a "significant procedural error" for the sentencing judge to fail to fulfill this "first" requirement. Gall v. United States, 552 U.S. 38, 51 (2007). And, we review a district court's "interpretation and

---

[11] As explained in Kimbrough, the Commission's institutional strengths include its ability to base "determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." 552 U.S. at 109 (quotation omitted). In contrast, a sentencing court's institutional strengths include its "greater familiarity with . . . the individual case and the individual defendant before [it]." Id. (quotation omitted).

application of the guidelines de novo." United States v. Bryant, 606 F.3d 912, 918 (8th Cir. 2010).[12]

Accordingly, the district court's interpretations of the intrinsic breadth or limitations of § 2R1.1, the court's rejection, at least in part, of that guideline for use in the sentencing of VandeBrake, and the court's alternative interpretation, application and use of § 2B1.1 in lieu of § 2R1.1 should all have been reviewed by this court de novo. Further, if the sentencing court's numerous erroneous acts had been so reviewed, it is my belief that they would have been summarily rejected by this court.

Concluding, for purposes of further discussion only, that the sentence calculation in this case is procedurally sound and survives de novo review, the sentencing court's bald assumption that it has deferential discretion to substantially vary from all guidelines on policy grounds is reversible error.

Under Kimbrough analysis, you must first determine whether the applicable guideline is the product of the Sentencing Commission's inherent expertise. Kimbrough's result only depicts judicial analysis of a guideline that was not the product of the Commission's institutional strengths. The guideline at issue here, on the other hand, embodies the Commission's expertise. Thus, Kimbrough does not support the notion that the sentencing court's policy disagreement with § 2R1.1 is entitled to deferential abuse-of-discretion review.

Indeed, Kimbrough acknowledges that "closer review may be in order" if a sentencing judge varies from an applicable guideline that is the product of the Commission's institutional strengths, based solely on the judge's opinion, as here, that

---

[12]To be sure, the sentencing judge's findings of fact are reviewed for clear error and, if we find no procedural error, we review the substantive reasonableness of the sentence for an abuse of discretion. Dace, 660 F.3d at 1013.

the guideline "fails properly to reflect § 3553(a) considerations even in a mine-run case." 552 U.S. at 109 (internal quotation omitted); see also Spears, 555 U.S. at 264 (explaining that this brand of variance "may be entitled to less respect"). The sort of categorical policy-based variance applied by the sentencing court in this case stands in stark contrast to a district court's variance based on the *particular* facts of an *individual* case, which is entitled to "greatest respect" because it exemplifies the district court's institutional strengths. Kimbrough, 552 U.S. at 109; see Feemster, 572 F.3d at 464 (explaining that substantive appellate review in sentencing cases is "narrow and deferential," but only when the district court's justifications for the sentence are based on "defendant-specific" determinations). Therefore, to determine the deference to be given the district court's variance here, we must begin with an analysis of whether or not § 2R1.1 (or for that matter § 2B1.1) is the product of the Commission's expertise.

As a general matter, the Sentencing Commission employed an "empirical approach" to formulate its several guidelines. Kimbrough, 552 U.S. at 96. Under this approach, the Commission first conducted "an empirical examination of 10,000 presentence reports setting forth what judges had done in the past." Rita v. United States, 551 U.S. 338, 349 (2007). Then, the Commission "modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like." Id. Since the initial crafting of the guidelines, the Commission has been charged with "formulat[ing] and constantly refin[ing] national sentencing standards." Kimbrough, 552 U.S. at 108. The Commission's institutional strength, then, is its ability to "base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." Id. at 109 (quotation omitted).

As stated above, Kimbrough provides an example of a guideline that was not a product of the Commission's expertise. There, the Court found that the guidelines' 100:1 powder/crack ratio was not based on the Commission's empirical research;

rather, the ratio was simply borrowed from the ratio Congress used to set minimum and maximum sentences in the Anti-Drug Abuse Act of 1986.[13]  Id. at 95-96.  And, in turn, the Act's ratio was based on Congress's mere assumptions regarding the relative dangerousness of crack.  Id. at 95.  After adopting the 100:1 ratio in the original guidelines, the Commission's research revealed that many of the assumptions used to justify the 100:1 ratio were baseless.  Id. at 97-98.  The Commission therefore attempted to amend the guidelines to reduce the ratio to 1:1, but Congress blocked this attempt pursuant to 28 U.S.C. § 994(p), which provides that the Commission's guideline amendments become effective unless disapproved by Congress.  Id. at 99.  Given that the guidelines' 100:1 ratio was (1) no longer supported by the Commission, and (2) contrary to the Commission's research, the Court held that the ratio did not "exemplify the Commission's exercise of its characteristic institutional role."  Id. at 109.

In contrast to the 100:1 ratio at issue in Kimbrough, the antitrust guideline at issue here, § 2R1.1, exemplifies the Commission's institutional strengths.  The legislative history of 28 U.S.C. § 994, which outlines the duties of the Commission, provides that, in crafting the guidelines,

> the Commission might conclude that a category of major white collar criminals too frequently was sentenced to probation or too short a term of imprisonment because judges using the old rehabilitation theory of sentencing[] did not believe such offenders needed to be rehabilitated and, therefore, saw no need for incarceration.  The Commission might conclude that such a category of offenders should serve a term of imprisonment, or a longer term than currently served, for purposes of punishment and deterrence.

---

[13]For example, the Act set a five-year mandatory minimum sentence for defendants responsible for 5 grams of crack or 500 grams of powder, respectively.  Kimbrough, 552 U.S. at 96.

S. Rep. No. 98-225, at 177 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3360. Following Congress's cue, the Commission's first version of the guidelines increased the mean sentences of white-collar crimes above then-current averages to reduce the disparity between white-collar crimes and other property crimes, such as larceny. U.S. Sentencing Comm'n, Supplementary Report on the Initial Sentencing Guidelines & Policy Statements 18 (1987).

As with other white-collar crimes, the Commission deliberately raised the sentences for antitrust violations above pre-guidelines averages. The background notes accompanying § 2R1.1 state that prison terms for antitrust offenses "should be much more common, and usually somewhat longer, than typical under pre-guidelines practice." U.S.S.G. § 2R1.1 cmt. background (2010). Indeed, the original sentencing ranges in § 2R1.1 "represent[ed] a substantial change from [then-present] practice. [Under pre-guidelines practice], approximately 39 percent of all individuals convicted of antitrust violations [were] imprisoned" and "the average time served . . . was only forty-five days." U.S.S.G. § 2R1.1 cmt. background (1987).

While the Commission increased offense levels for fraud based on "loss" in U.S.S.G. § 2B1.1, the Commission decided to use "volume of commerce" to gauge the scale and scope of antitrust offenses under § 2R1.1. As the Commission explained,

> The offense levels [in § 2R1.1] are not based directly on the damage caused or profit made by the defendant because damages are difficult and time consuming to establish. The volume of commerce is an acceptable and more readily measurable substitute. The limited empirical data [as to pre-guidelines practice] show that fines increase with the volume of commerce and the term of imprisonment probably does as well.

U.S.S.G. § 2R1.1 cmt. background (1987).

The first significant[14] amendment to § 2R1.1 came in 1991 when the Commission increased the guideline's offense levels and added more steps to the volume of commerce table. U.S.S.G. app. C, amend 377. The Commission increased the offense levels in § 2R1.1 "to make them more comparable to the offense levels for fraud with similar amounts of loss." Id. The Commission also explained the differences between the antitrust and fraud guidelines as follows:

> The base offense level for antitrust violations starts higher than the base offense level for fraud violations to reflect the serious nature of and the difficulty of detecting such violations, but the offense levels for antitrust offenses based on volume of commerce increase less rapidly than the offense levels for fraud, in part, because, on the average, the level of mark-up from an antitrust violation may tend to decline with the volume of commerce involved.

Id.

In 2005, the Commission again amended § 2R1.1 to raise the offense levels for antitrust violations and add additional steps to the volume of commerce table. U.S.S.G. app. C., amend 678. The amendment was in response to Congress's enactment of the Antitrust Criminal Penalty Enhancement and Reform Act of 2004, which increased from three to ten years the maximum term of imprisonment for antitrust violations under 15 U.S.C. § 1. U.S.S.G. app. C, amend. 678. The Act's legislative history indicates that Congress increased the maximum penalties for antitrust violations to "harmonize[] the treatment of criminal antitrust offenders and other white collar criminals" and to send the message to antitrust offenders that "if they are caught they will spend much more time considering the consequences of their actions within the confinement of their prison cells." 150 Cong. Rec. H3657

---

[14]Section 2R1.1 was amended in 1989 to "eliminate minor gaps in the [volume of commerce] table." U.S.S.G. app. C, amend. 211.

(daily ed. June 2, 2004) (statement of Rep. Sensenbrenner). The Commission noted Congress's "concern about the inherent seriousness of antitrust offenses" and also explained that "[t]he penalties for sophisticated fraud have been increased incrementally due to a series of amendments to § 2B1.1, while no commensurate increases for antitrust offenses had occurred." U.S.S.G. app. C., amend. 678. Since "[t]he Commission ha[d] long recognized the similarity of antitrust offenses to sophisticated frauds," the Commission amended § 2R1.1 to ensure "that penalties for antitrust offenses will be coextensive with those for sophisticated frauds sentenced under § 2B.1.1." Id. According to the Commission, the amendment helped "restore the historic proportionality in the treatment of antitrust offenses and sophisticated frauds." Id.

The history of and the amendments to § 2R1.1 exemplify the Commission's institutional strengths. Indeed, in order to craft the original version of § 2R1.1, the Commission used empirical research as its baseline and then increased antitrust sentences in the interests of "greater rationality" and to avoid "inconsistency" between white-collar crimes and other property crimes. Rita, 551 U.S. at 349. Thus, unlike the guideline at issue in Kimbrough, the antitrust guideline and its volume of commerce table were grounded in the Commission's research, not plucked from a statute or based on mere assumptions. And, since originally crafting § 2R1.1, the Commission has amended the guideline in order to fulfill its duty to "constantly refine national sentencing standards." Kimbrough, 552 U.S. at 108. It seems that the driving forces behind the Commission's amendments to § 2R1.1 have been: (1) Congress's amendments to the Sherman Act; and (2) the Commission's desire to maintain the historic proportionality between antitrust and fraud sentences. Thus, unlike the 100:1 ratio at issue in Kimbrough, Congress and the Commission are apparently on the same page regarding antitrust sentences and the Commission's

continuing research has not eroded the underlying theories supporting the antitrust guideline.[15]

---

[15]The majority concludes that the antitrust guideline does not exemplify the Commission's institutional strengths and, therefore, applying closer review in this case "conflicts . . . with Kimbrough itself." Ante at 13. This conclusion is based on the court's apparent assumption that a guideline is not the product of the Commission's inherent strengths if, occasionally over a period of twenty-five years, the Commission has amended the guideline due, in part, to congressional amendments to the guideline's corresponding criminal statute. I find no support for this broad assumption in Kimbrough. Indeed, the Supreme Court went to great lengths in Kimbrough to distinguish the unique 100:1 powder/crack ratio from the vast majority of other guidelines which, like the antitrust guideline, were (1) based on an empirical analysis of past practices; (2) adjusted to avoid inconsistency and irrationality; and (3) have since been subjected to ongoing revision in response to sentencing practices. See Kimbrough, 552 U.S. at 94-100, 107.

The majority also contends that applying closer review in this case is contrary to the approach adopted by our sister circuits in United States v. Henderson, 649 F.3d 955 (9th Cir. 2011), and United States v. Grober, 624 F.3d 592 (3d Cir. 2010). In those cases, the courts held that, due to substantial congressional involvement, the child pornography guideline at issue was not the product of the Commission's institutional strengths. See Henderson, 649 F.3d at 962 ("Most of the revisions [to the child pornography guideline] were Congressionally-mandated and not the result of [the Commission's] empirical study."); Grober, 624 F.3d at 608 (explaining that the child pornography guideline was "developed largely pursuant to congressional directives"). While a full-scale analysis of the child pornography guideline is not necessary here, I note that the view espoused in Henderson and Grober is not universal. See United States v. Pugh, 515 F.3d 1179, 1201 n.15 (11th Cir. 2008) (holding that the child pornography guidelines "do not exhibit the deficiencies the Supreme Court identified in Kimbrough"). Assuming for the sake of argument that Grober and Henderson were based on sound reasoning, there are significant differences between the child pornography guideline and the antitrust guideline at issue here. In Grober, the court found that the Commission has repeatedly, but "sometimes reluctantly," amended the child pornography guideline in response to explicit congressional directives. 624 F.3d at 607. Additionally, the court in

-28-

Given that the antitrust guideline is a product of the Commission's institutional strengths, <u>Kimbrough</u> provides that a categorical variance based solely on a district court's policy disagreement with the guideline may be subject to "closer review." <u>Id.</u> at 109. After making this observation, the Supreme Court immediately noted that since the subject matter of its <u>Kimbrough</u> discussion was limited to the guidelines' 100:1 powder/crack ratio, it had "no occasion for elaborative discussion" of instances dealing with guidelines that embody the Commission's institutional strengths. <u>Id.</u> And it has not yet done so.

Cases and commentators have struggled a bit, as do I, with the reach of <u>Kimbrough</u>'s "closer review may be in order" language.[16] For some help, I turn to the

_____

<u>Henderson</u> emphasized that, in an unprecedented action, Congress itself directly amended the child pornography guideline in 2003. <u>Henderson</u>, 649 F.3d at 962. In contrast, Congress has never directly amended the antitrust guideline and, as discussed above, there is no indication that the Commission's hand was unwillingly forced to amend the guideline or that the Commission's research does not support such amendments.

Finally, in <u>Kimbrough</u> the Court held that, because the 100:1 ratio and its "disproportionately harsh sanctions" did not exemplify the Commission's institutional strengths, district courts could vary *downward* on that basis without abusing their discretion. 552 U.S. at 110 ("Given [the unique history of the 100:1 ratio], it would not be an abuse of discretion for a district court to conclude . . . that the crack/powder disparity yields a sentence '*greater* than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." (emphasis added)). Here, the majority finds that the Commission's decision to consistently *increase* antitrust sentences above pre- and post-guidelines practice is not based on empirical research. <u>See</u> <u>Ante</u> at 13. While such a conclusion would arguably support a *downward* variance under <u>Kimbrough</u>, it is not clear how this finding supports the district court's substantial *upward* variance.

[16]The Third Circuit has held that, to the extent a district court's sentence is based on a policy disagreement with the guidelines, "such a disagreement is permissible only if a [d]istrict [c]ourt provides sufficiently compelling reasons to

<u>Kimbrough</u> opinion's reference to oral argument in <u>Gall</u>, a case argued before the Supreme Court on the same day as <u>Kimbrough</u>. <u>Id.</u> at 109 (citing Tr. of Oral Arg. at 38-39, <u>Gall v. United States</u>, 552 U.S. 38 (2007)). From this reference, it is clear that the Court differentiated between judicial discretion arising from case-specific individualized features within the better discernment of the sentencing court and "I

justify it." <u>Lychock</u>, 578 F.3d at 219 (internal quotation omitted). And, in <u>Irey</u>, the Eleventh Circuit reversed a below-guidelines sentence under "closer review" where the sentence reflected an "unreasonable and a clear error in judgment." 612 F.3d at 1203.

Finally, Third Circuit Judge D. Michael Fisher, in his article <u>Still in Balance? Federal District Court Discretion and Appellate Review Six Years after Booker</u>, commented:

> The Supreme Court has actually provided further guidance in <u>Gall</u> and <u>Kimbrough</u> in the form of a heightened review. The courts of appeals should remember that these statements are valuable tools for defining the scope of substantive reasonableness, not hindrances to effective appellate review. By employing the heightened review imagined in <u>Gall</u> and <u>Kimbrough</u>, the courts of appeals can characterize "reasonableness" as a continuum, rather than a single point. Consequently, courts may shift to a closer form of reasonableness review when a particular sentence calls for it and to more deferential review when it does not. This tactic will be particularly useful in cases where district courts attempt to push the bounds of their discretion by imposing sentences well outside the advisory [g]uideline range, or where they try to shoehorn a new policy objection into the <u>Kimbrough</u> framework. By recognizing that a particular sentence may be subject to *much closer scrutiny*, district court judges will be encouraged to consider all of the relevant factors when making a sentencing determination, rather than imposing sentences that increase disparity.

49 Duq. L. Rev. 641, 672 (2011) (emphasis added).

don't agree with the policy of the guideline" emanations from the same source. Tr. of Oral Arg. at 39, Gall v. United States, 552 U.S. 38 (2007).

Reading the Supreme Court's "closer review may be in order" language in context, and mainly applying the first of the two primary meanings of the word "may,"[17] it is clear that the Supreme Court presents this court with permission and discretion to impose "closer review" upon the district court's idea that the policy espoused by the Sentencing Commission in § 2R1.1 is faulty. It is my view that there is little support for a substantial variance from a guidelines range calculated under § 2R1.1 based upon the district court's misguided policy dispute with the Sentencing Commission. But, even assuming for the sake of argument that this case properly presents a variance based both upon individualized factors within the better understanding of the sentencing judge and upon a validly formulated sentencing court policy disagreement with a Commission-created sentencing guideline, the variance must still be reviewed by this court under the correct standards of review outlined above, using the obvious grant of precedent-building leadership the Supreme Court delegated to the circuit courts in Kimbrough.

Today, the court majority does not apply "closer review" or explore its contours in any detail. Instead, the court applies only the deferential standard of review articulated in Feemster and finds that the district court's "policy disagreement with the antitrust guidelines . . . [was a] permissible reason[] for varying from the guidelines." Ante at 10-11. As Judge Colloton's concurring opinion in Feemster

---

[17]The term "may" has two primary meanings. First, "may" is used to denote permission or discretion. See Black's Law Dictionary 1068 (9th ed. 2009) (defining "may" as "[t]o be permitted to"). Second, "may" could be used to refer to a possibility. See id. When used in this manner, however, "may" should be distinguished from "might"–"may" expresses likelihood whereas "might" expresses a stronger sense of doubt. Bryan A. Garner, Garner's Modern American Usage 529 (3d ed. 2009).

noted, however, the deferential standard of review articulated in <u>Feemster</u> did not address the "closer review" question left open in <u>Kimbrough</u>, which is at the heart of this case. <u>Feemster</u>, 572 F.3d at 468 n.12 (Colloton, J., concurring). Accordingly, I would vacate this sentence and remand it for further consideration using only § 2R1.1 for initial guidance and for a greatly enhanced consideration of the institutional strengths of the Sentencing Commission implemented through much less consideration of the sentencing court's stated anathema toward "greedy multi-millionaire businessmen," assuming, without deciding, that such a person is before the court today.

Because of the sentencing court's assault on the Sentencing Commission in this case, and by way of epilogue to this dissent, I have used the Commission's annual source books to gather some statistics and create some tables, two of which I append to this dissenting opinion as examples. Since VandeBrake had a criminal history category of I and should have been sentenced under the current version of § 2R1.1, which became effective November 1, 2005, Table 1 depicts the mean and median sentences for antitrust offenders with a criminal history category of I between fiscal years (FYs) 2006 and 2010. During those years, the mean sentences for antitrust offenders fluctuated between 5.8 and 19.2 months, and the median sentences fluctuated between 5 and 14.5 months. Obviously, VandeBrake's 48-month sentence is well above the five-year mean and median sentences for other antitrust offenders in the same criminal history category.

My research reveals that there were only a few hundred offenders sentenced for committing antitrust violations between FYs 1996 and 2011. The statistics also demonstrate that, over a period of 15 years, VandeBrake was the *only* antitrust offender sentenced above the guidelines range.[18] Indeed, out of some 230 offenders

---

[18]The preliminary data for FY 2011 indicates that one antitrust offender was sentenced above the guidelines via an upward variance. Since VandeBrake was

sentenced under § 2R1.1 since FY 1997, 83 were sentenced within the guidelines range and 146 were sentenced below the guidelines range. Similarly, since FY 1996, of the 288 offenders sentenced with an antitrust violation being the "primary offense," 95 were sentenced within the guidelines range and 192 were sentenced below the guidelines range.[19]

While the district court did not discuss these particular statistics in its opinion, it did discuss the sentences handed down in several published antitrust opinions. VandeBrake, 771 F. Supp. 2d at 1009-10. The court recognized that VandeBrake's sentence was "higher than some recent sentences imposed for violations of the same

_____

sentenced during FY 2011, I presume the lone above-guidelines sentence reported in 2011 is VandeBrake's sentence.

[19]According to the Department of Justice's website, VandeBrake's 48-month sentence for antitrust violations "tied the record for the longest jail sentence ever imposed on a defendant solely convicted of violating the antitrust laws." Dep't of Justice, Antitrust Division Update, Spring 2011, available at http://www.justice.gov/atr/public/division-update/2011/criminal-program.html. It appears that the other 48-month sentence was issued in United States v. Baci, 3:08-cr-00350-TJC-TEM (M.D. Fla. 2008). In Baci, the government charged an executive of a Florida shipping corporation with rigging bids and fixing prices in the shipping industry over a six-year period, in violation of 15 U.S.C. § 1. Plea Agreement 2-5, ECF No. 18. Baci pled guilty pursuant to a plea agreement and conceded that the volume of commerce affected by his criminal conduct totaled over $1 billion. Id. at 7. The district court calculated Baci's guidelines range at 87 to 108 months and, based on Baci's substantial assistance, granted the government's U.S.S.G. § 5K1.1 motion for a downward departure. Sentencing Tr. 8, 84, ECF No. 38. Ultimately, Baci was sentenced to 48 months' imprisonment and a $20,000 fine which, at the time, represented the longest jail term ever imposed for a single antitrust violation. Judgment 2-4, ECF No. 43; Press Release, Dep't of Justice, Former Shipping Executive Sentenced to 48 Months in Jail for His Role in Antitrust Conspiracy (Jan. 30, 2009), available at http://www.justice.gov/atr/public/press_releases/2009/242030. htm.

statute," but concluded that some disparity was to be expected given that it was the first court to ever vary above the antitrust guideline range based, in part, on policy grounds. Id. at 1011. To be sure, the Supreme Court has recognized that "some departures from uniformity" are to be expected as a result of its holding in Booker. Kimbrough, 552 U.S. at 108. But, the Court has also recognized that "uniformity remains an important goal of sentencing" and that "appellate review for reasonableness and ongoing revision of the [g]uidelines in response to sentencing practices will help to avoid *excessive* sentencing disparities." Id. at 107 (emphasis added) (internal quotation omitted).

While we may no longer employ a "rigid mathematic formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence," Gall, 552 U.S. at 47, the Supreme Court "find[s] it uncontroversial that a major departure should be supported by a more significant justification than a minor one." Id. at 50. Although district courts' sentencing decisions are typically entitled to substantial deference, "[t]here is a difference . . . between recognizing that another usually has the right of way and abandoning one's post." United States v. Kane, 639 F.3d 1121, 1136 (8th Cir. 2011) (quotation omitted), cert. denied, 2012 WL 538743 (2012).

Here, VandeBrake's 48-month sentence reflects a significant variance above his 21- to 27-month guidelines range under § 2R1.1, and his $829,715.85 fine is significantly higher than the guidelines range of $56,663.49 to $283,317.43.[20] For what it's worth, VandeBrake's non-binding plea agreement recommended a sentence of 19 months and a $100,000 fine. The district court attempted to justify VandeBrake's 48-month sentence by emphasizing VandeBrake's greed and by

---

[20]U.S.S.G. § 2R1.1(c) provides that, "[f]or an individual, the guideline fine range shall be from one to five percent of the volume of commerce, but not less than $20,000."

contrasting the guidelines ranges of §§ 2R1.1 and 2B1.1.  The district court also increased VandeBrake's fine to reflect the losses caused by VandeBrake and to ensure that, in light of VandeBrake's wealth, the fine was punitive.  VandeBrake, 771 F. Supp. 2d at 1011-12.

The district court also explained that, if it did not vary upward, it would still issue a 48-month sentence by issuing consecutive sentences.  Id. at 1013.  It appears that the district court took this action to "bulletproof" its sentence.  After all, we have held that "the district court has broad statutory authority, pursuant to 18 U.S.C. § 3584, to impose consecutive terms."  United States v. Lone Fight, 625 F.3d 523, 525 (8th Cir. 2010), cert. denied, 131 S. Ct. 2474 (2011).  But, while issuing this alternative sentence, the district court incorporated its previous analysis of the § 3553(a) factors, which included its policy disagreement with § 2R1.1.  VandeBrake, 771 F. Supp. 2d at 1013.  Therefore, any taint from the district court's decision to vary upward under § 3553(a) would infect its alternative sentence.

As earlier noted, the district court committed procedural error and made guideline interpretations which the court majority has not subjected to de novo review.  U.S.S.G. § 2R1.1 exemplifies the Commission's institutional strengths and a "closer review" is in order in this case because the district court varied upward based, in part, on its policy disagreement with § 2R1.1.  The greatest flaw in the court majority's opinion is its failure to apply the "closer review" contemplated in Kimbrough, and its assumption that the standard of review articulated in Feemster applies in cases such as this.  VandeBrake's sentence is the first above-guidelines antitrust sentence in fifteen years because the district court found that the rationale underlying § 2R1.1's volume of commerce table did not apply.  Under "closer review," I would reverse VandeBrake's 48-month sentence and remand for resentencing.  Accordingly, I dissent.

**APPENDIX**

**TABLE 1: PRISON SENTENCES FOR ANTITRUST OFFENDERS IN CRIMINAL HISTORY CATEGORY I BETWEEN FYS 2006 AND 2010**

| Fiscal Year | Number of Offenders Sentenced to Imprisonment | Mean Months | Median Months |
|---|---|---|---|
| 2006 | 8 | 5.8 | 5 |
| 2007 | 11 | 19.2 | 9 |
| 2008 | 9 | 10.8 | 6 |
| 2009 | 12 | 18.2 | 14.5 |
| 2010 | 8 | 6.6 | 6.5 |

*Source: U.S.S.C. Sourcebooks at http://www.ussc.gov/Data_and_Statistics/archives.cfm.*

**TABLE 2: ANTITRUST PRIMARY OFFENSE SENTENCING TRENDS (POST-BOOKER)**

| Fiscal Year | Number of Offenders Sentenced | Sentences Within Guidelines Range | Upward Departure OR Variance | Downward Departure OR Variance |
|---|---|---|---|---|
| 2005 (Post-Booker) | 11 | 4 | 0 | 7 |
| 2006 | 12 | 0 | 0 | 12 |
| 2007 | 15 | 2 | 0 | 13 |
| 2008 | 24 | 4 | 0 | 20 |
| 2009 | 20 | 0 | 0 | 20 |
| 2010 | 16 | 3 | 0 | 13 |
| 2011 (preliminary data) | 10 | 1 | 1 | 8 |
| **Total** | **108** | **14** | **1**[21] | **93** |

*Source: U.S.S.C. Sourcebooks at http://www.ussc.gov/Data_and_Statistics/archives.cfm.*

[21]Since VandeBrake was sentenced in 2011, I assume that the single upward variance noted in this appendix represents VandeBrake's sentence.